UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ERIC S. BRITTAIN, KAELA MEI-CHEE : 
CHAMBERS, JOANNA CHRISTINA CORTEZ,
ANTONIO RATTES DE FARIAS, CAITLIN : 20 Civ. _____ (_____)
FERRELL, KATHRYN MILLER, GRACE A.
PHILIPS, BRADLEY M. PITTS, AVA RAVICH, : CLASS ACTION COMPLAINT
ANA I. DOW SILVA, JACLYN E. TODD,
DONOVAN TOLLEDO, and RICARDO J. : JURY TRIAL DEMANDED
VARONA, on behalf of themselves and all
others similarly situated, :

             Plaintiffs,           :

         - against -                :

TRUSTEES OF COLUMBIA UNIVERSITY IN :
THE CITY OF NEW YORK,
                                    :
             Defendant.
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs, on behalf of themselves and all others similarly situated, by their attorneys identified below, for their class action complaint against defendant Trustees of Columbia University in The City of New York, allege as follows:

**Nature of Action**

1. This is a class action for breach of an implied-in-fact contract and for unjust enrichment brought by students at the Columbia University Graduate School of the Arts pursuing courses of graduate study in visual and sound art and in film. On their own behalf and on behalf of the class of persons they represent, plaintiffs seek damages or restitution of tuition and fees paid to defendant with respect to the spring semester of 2020 and any other period

during which plaintiffs and the class pay tuition and fees and defendant fails to provide them with the education it promised them. More specifically, plaintiffs seek recovery in this case for breach by defendant of its explicit promises made concerning and in connection with their courses of study, including but not limited to promises of studio-based, hands-on education in visual art and sound art, and skills-based learning predicated on the actual production of film in the course of film study.

## Jurisdiction

2.      The jurisdiction of this Court is founded upon 28 U.S.C. §§1332(d)(2)(A) and 1332(d)(2)(B), in that the matter in controversy exceeds the sum or value of Five Million Dollars ($5,000,000), exclusive of interest and costs, and the action is a class action in which at least one member of the plaintiff class is a citizen of a State different from the citizenship of defendant and at least one member of the plaintiff class is a citizen or subject of a foreign state and defendant is a citizen of a State.

## Parties

3.      Plaintiff and class representative Eric S. Brittain is a citizen of the State of New York.

4.      Plaintiff and class representative Kaela Mei-Chee Chambers is a citizen of the State of New Jersey.

5.      Plaintiff and class representative Joanna Christina Cortez is a citizen of the State of Rhode Island.

6.      Plaintiff and class representative Antonio Rattes de Farias is a citizen of the Nation of Brazil.

7. Plaintiff and class representative Caitlin Ferrell is a citizen of the State of Colorado.

8. Plaintiff and class representative Kathryn Miller is a citizen of the State of New York.

9. Plaintiff and class representative Grace A. Philips is a citizen of the State of New York.

10. Plaintiff and class representative Bradley M. Pitts is a citizen of the State of New York.

11. Plaintiff and class representative Ava Ravich is a citizen of the State of New York.

12. Plaintiff and class representative Ana I. Dow Silva is a citizen of the State of New York.

13. Plaintiff and class representative Jaclyn E. Todd is a citizen of the State of Illinois.

14. Plaintiff and class representative Donovan Tolledo is a citizen of the State of Illinois.

15. Plaintiff and class representative Ricardo J. Varona is a citizen of the State of New York.

16. Defendant Trustees of Columbia University in The City of New York is a private university operating in the City of New York with its headquarters located at 2960 Broadway, New York, NY 10027. ("Trustees of Columbia University in The City of New York" is the technical name of defendant as embodied in the charter granted it by the legislature of the State of New York. Defendant is hereinafter called "Columbia" or "Columbia University").

Columbia is a non-profit educational institution organized under the laws of the State of New York. For diversity of citizenship purposes, Columbia is a citizen of the State of New York.

17. Columbia University's yearly budget for 2019 was over $5 billion. It holds an endowment exceeding $11 billion.

## Class Action Allegations

18. Plaintiffs were students enrolled in the Columbia Graduate School of the Arts during the spring semester of 2020 pursuing courses of graduate study in visual and sound art and in film. They bring this action individually and on behalf of a class consisting of themselves and all other students who, similarly, were enrolled in the Columbia Graduate School of the Arts and pursuing the same courses of study during that same period.

19. Plaintiffs estimate that the class consists of over 200 individuals, at least two-thirds of whom are citizens of states other than the State of New York or citizens or subjects of a foreign state.

20. For the 2019-2020 school year, there were thirty (30) first-year students and thirty-one (31) second-year students in the visual art and sound art programs.

21. For the 2019-2020 school year, there were over one hundred and fifty (150) students in the film program.

22. The action is properly maintainable as a class action because:

a. The class is so numerous that joinder of all members is impracticable;

b. Common questions of law and fact predominate over questions affecting individual members of the class, including whether defendants' promises with respect to courses of study in the School of the Arts constitute an enforceable implied-in-fact contract, whether and how defendant breached that implied-in-fact contract with

plaintiffs and the class, whether defendant has been unjustly enriched through its retention of tuition and certain fees, and what damages or restitution should be assessed or ordered, respectively, against Columbia;

c.      Plaintiffs' claims are typical of the claims of the other members of the class, and plaintiffs are adequate representatives of and will adequately protect the interests of the class in that their claims typify claims of other graduate students in visual art, sound art, and film at the Columbia Graduate School of the Arts who were or are candidates for the degree of Master of Fine Arts; and

d.      Plaintiffs, who were or are student leaders and representatives, will fairly and adequately protect the interests of the class and have retained competent counsel experienced in litigation of this nature to prosecute their claims.

## Facts Common to the Claims for Relief

### The Plaintiffs

23.     During the spring semester of 2020, plaintiffs Eric S. Brittain, Kaela Mei-Chee Chambers, Joanna Christina Cortez, Kathryn Miller, Bradley M. Pitts, and Ava Ravich were enrolled in the Graduate School of the Arts at Columbia University and were following a course of graduate study in the visual and sound art program leading to the awarding of a Master of Fine Arts ("MFA") degree. The visual and sound art program is a two-year course of study.

24.     During the spring semester of 2020, plaintiffs Caitlin Ferrell, Ana I. Dow Silva, Antonio Rattes de Farias, Grace A. Philips, Jaclyn Todd, Donovan Tolledo, and Ricardo J. Varona were enrolled in the Graduate School of the Arts at Columbia University during the spring semester of 2020 and were following a course of graduate study in film leading to the awarding of a Master of Fine Arts degree. Film is a three- to five-year course of study, with

students completing coursework during their first two years in the program and then advancing to the status of Research Arts Students to complete their Thesis Film and other program requirements.

25. Plaintiffs represent a class that is a cross-section of our country and the world, from many of the United States and from many foreign nations. Plaintiffs were attracted to Columbia by its reputation, by the highly-ranked fine arts education it promised to provide to them, and by the specific attributes of the fine arts education it offered that enable graduates of the School of the Arts to emerge from their studies having produced visual and sound artwork and film that will provide them with a solid foundation on which to succeed and prosper in the arts. Student artwork and film work completed during the course of the MFA education at the Columbia Graduate School of the Arts is expected to be and often is a springboard for careers in the arts.

### The Columbia University Graduate School of the Arts

26. The Columbia Graduate School of the Arts is one of 20 separate schools at Columbia. As of October 2019, Columbia counted 33,413 enrolled students across the university, and the School of the Arts counted 862 enrolled students. In excess of 200 students at the School of the Arts were pursuing programs in visual art, sound art, or film in the spring semester of 2020.

27. Student tuition for the MFA programs at Columbia is among the highest in the United States, if not the world. For the school year that began in the Fall of 2019, first and second year tuition was $32,558 per term. Tuition is high because, among other reasons, facilities and equipment that are the core of these fields are expensive and education is hands-on and intensive, with one professor teaching or critiquing one student at a time individually in their

studios as the norm, or with professors and outside critics supervising and critiquing the making of films and finished film productions. Students from their first day of study are expected to create professional level sound or visual art or film.

### The Nature of the Education at the Columbia Graduate School of the Arts

28. Hands-on learning and the creation of works of art or films are the vital elements of education in visual and sound art and in film at the Columbia School of the Arts. Education is focused on the production of sound and visual artwork and films. For visual and sound art, this is accomplished in studio settings using specialized equipment. For film, this is done on film sets and post-production facilities using an array of equipment used in professional film.

29. In sound and visual arts, these facilities are highly specialized studio spaces, and without access to them and to the equipment they contain, for both students and critiquing teachers and visiting artists, the education offered by the School of the Arts loses its core value. In film, students are afforded access to rehearsal and audition spaces, to filming locations, to professional-level film production equipment owned by Columbia that is prohibitively expensive for individual students to access outside the auspices of the school, as well as to computer labs for post-production work on films.

### The Nature of the Contract Between the Plaintiff Class and Columbia

30. The relationship between plaintiffs and the plaintiff class, on the one hand, and defendant on the other, is contractual in nature. While no formal written contract governs that relationship (except the lease agreement described below), an enforceable contract arises from or may be implied from the specific oral and written promises made by Columbia to its MFA students and from the presumed intention of the parties as indicated by their conduct.

31. The contract, and the contractual relationship evidenced by it, is contained in a series of documents authored, promulgated, and disseminated by Columbia which describe and define that relationship and set forth certain specific promises and representations relating to the education to be afforded by Columbia to plaintiffs. Such documents include but are not limited to catalogues, regulations, handbooks, statements included in manuals, studio lease and facilities agreements and related documents, and registration materials. The statements in such documents, taken as a whole or in reasonable part, as well as the parties' conduct in furtherance of those statements, express the parties' contractual intent.

32. Four principal documents form the contract between plaintiffs (and the class) and Columbia. These are the Visual Arts MFA Handbook (a copy of which for the period 2019-2020 is annexed hereto as Exhibit A), the Sound Art MFA Program Handbook (a copy of which for the period 2019-2020 is annexed hereto as Exhibit B), the film program handbook (a copy of which for the period 2019-2020 is annexed hereto as Exhibit C), and the studio leases (a sample of which is annexed hereto as Exhibit D).

33. Descriptions of courses and coursework, requirements for completion of various stages of education, expected milestones, references to the work to be completed, and other aspects of these materials constitute specific binding and enforceable contractual promises. That is, they constitute promises made by Columbia to MFA students in return for which students are charged and pay tuition and fees.

**The Specific Promises and Representations Regarding Education
at the Graduate School of the Arts in the Visual Arts and the Sound Arts**

34. Specifically, the materials disseminated by Columbia and by the Graduate School of the Arts to plaintiffs who were pursuing courses of graduate study in the visual arts and in the sound arts both describe and prescribe a rigorously studio-based model of hands-on

8

education. Research and experimentation in the studio and in other specialized facilities constitutes the core of that education along with in-person studio visits and critiques with faculty, peers, and visiting critics. Education centers on the production of sound and visual artwork, and is accomplished in a studio setting afforded by Columbia, whether art studio or specialized equipment studio.

35. With respect to visual art and sound art, the core curriculum comprises (a) Graduate Studio (a weekly studio visit in which faculty views and discusses recent studio work and research in person), (b) Group Critique (in which a group of 5-7 peers along with a faculty member convene in each student's studio to review and discuss recent work), (c) Visiting Artist Lecture Series (in which a Visiting Artist gives a weekly lecture on his or her work and conducts in-person studio visits with students), and (d) Mentor Weeks (in which, twice a semester, groups of 15-20 students convene with an artist Mentor (or Mentors) for the duration of the week for field trips to museums, studios, and other in-person activities, and discussions).

36. In addition to this core curriculum required to be completed every semester, students also take Studio Course electives such as Ceramics, Sculpture, Printmaking, Photography, Filming, Animation, and Moving Image, which also necessitate extensive access to specialized facilities, tools, and equipment in order to do the required coursework and research.

37. The two-year visual and sound art programs include required milestones that chart students' progress, generate exposure to the viewing public and career development opportunities, and show the culmination of studio-based research and creative production.

38. Milestones include (a) First Year Show (a professional public exhibition at Columbia's Lenfest Center For The Arts to take place during Spring of students' first year), (b)

Open Studios (a highly publicized event in the Fall for second year students to open their studios to the public, including curators, gallerists, collectors, and dealers, often generating career development opportunities), (c) Thesis Exhibition (a highly publicized, well-attended professional exhibition) in the Spring, in which second year students show the culmination of their research and studio-based work at the Lenfest Center For the Arts, and (d) Thesis Committee Review, an integral part of Thesis Exhibition.

39. As to the latter, Columbia counsels students that the exhibition and subsequent studio visits scheduled during the exhibition and the two months afterward in which students still have access to their Columbia studios and facilities will generate career development opportunities.

40. Student access to and use of the studios where artwork is created is also documented, at least in the case of visual art, by a written lease and facilities agreement. The preamble to the lease agreement itself confirms the value of the studios in the course of arts education: "[s]tudio practice is vital to [the] Columbia University School of the Arts Visual Arts Program. . . ." By means of the lease agreement, Columbia grants to students in the School of the Arts access to and use of a designated studio. Tuition is paid in part for such access and use.

## The Specific Promises and Representations Regarding Education at the School of the Arts in Film

41. The materials disseminated by Columbia to plaintiffs who were following courses of graduate study in film both describe and prescribe a rigorous program of hands-on learning and skill development, involving actual, professional-level film production. From their entry into the program, students are expected to engage in filmmaking and to conduct themselves as filmmakers, whether as directors, producers, or screenwriters, and to learn by doing. The

10

foundation of the film program's pedagogical approach is access to production and post-production resources; one-on-one advisement; and individually tailored production education.

42. Production education is central to the film program curriculum. Required coursework in the first year gives film students a crash course in the technical and practical aspects of filmmaking. First-year students are required to take equipment seminars during orientation when they commence the program, a course in post-production, a course in production equipment specialization, mandatory production and risk management seminars, and a year-long sequence of courses in film production—Practical Production I and Practical Production II.

43. Film productions in the film program fall into two categories: (a) "Exercises," which are smaller productions assigned to first-and second-year students in their Directing courses designed to foster development of the skills required to produce longer, professional-quality films and (b) "Projects" which are larger capstone productions that include two short-films produced during the first year of the program (the "3-5" and the "8-12"), the Second Year Film, and the Thesis Film, which is the culmination of the student's educational experience and accomplishment.

44. The film program further requires structured advisement for all Projects. Each student working on a project receives guidance and support from program faculty and staff of the program's Production Advisory Board ("PAB") through an exacting five-step advisement process that covers every phase of filmmaking from pre-production to completion: (a) Faculty Advisement, (b) Tech Advisement, (c) Production Advisement, (d) Risk Management and Approval; and (e) Final Post Advisement.

45. Students borrow film equipment and receive necessary training in the use of that equipment at the School of the Arts Production Center. Borrowing privileges at the Production Center are available to any student registered in production classes or who is working on a thesis-level project approved by their advisors and the Risk Management office. The Production Center imposes strict guidelines regarding reservation length and time needed for advance booking for equipment for each variety of Exercise and Project that students are required to complete as part of the film program curriculum.

46. Students in the film program rely, and are expected to rely, heavily on the computer labs in the School of the Arts Digital Media Center, which program materials describe as the students' "home-away-from-home" in order to complete post-production work.

47. Before embarking on any film production product, the students who are to produce, direct, and write that Project enter into a Production Agreement setting forth the time frame for development, pre-production, and principal photography, and allocating a budget. Every production undertaken by a film student must receive Risk Management approval and must be insured, and Worker's Compensation paperwork must be submitted for every production that involves cast or crew who are not affiliated with Columbia University.

48. Student access to and use of the film equipment in the Production Center and the labs in the Digital Media Center is essential to the completion of core curricular and degree requirements in the film program, as is the ability to shoot films under professional conditions. Borrowing privileges through the Production Center are coupled with great responsibility, as students must adhere to strict guidelines and timelines regarding the reservation, retention, and use of film equipment and potentially incur liability in the event of loss, damage, or destruction of such equipment. Students pay for access to these film production

and post-production equipment and resources through the tuition and fees they remit to Columbia University.

### The Effect of the Coronavirus Pandemic on Plaintiffs and the Class

49. The coronavirus pandemic that began spreading in the United States in early 2020 had well-documented effects on higher education. Virtually all (if not all) universities and colleges in the United States went into lockdown in March 2020. In the case of Columbia, this was only four or five weeks into the spring semester.

50. On March 15, 2020, the University notified the Columbia community that increased measures were necessary to respond to the rising health risks posed by the Coronavirus pandemic. On the same day, the Dean of the Graduate School of the Arts notified plaintiffs that they would no longer have access to their studios effective March 17, 2020.

51. The Columbia administration suspended in-person learning and moved all classes on-line using Zoom or similar platforms.

52. In the case of plaintiffs and the class, this entailed shutting off all access to studios and studio work as well as equipment appurtenant to studios, closing storage spaces and labs, shops, and other facilities in which work had been stored, suspending exhibitions of student work, including the First Year and Thesis Exhibitions, and discontinuing all film production work as well as access to film facilities and equipment.

53. For certain disciplines on-line learning can be an effective substitute for in-person learning. This is not the case with visual art, sound art, or film. By their nature, education in these fields requires physical presence in studios and production facilities, close coordination with instructors and others such as mentors, peers, and critics in the case of visual and sound art, and actors and production personnel in the case of film, as well as access both to

the physical studio and production spaces and to the specialized equipment used to produce artwork in these fields.

54. Without the studio practice that is vital to the course of education in sound art or visual art, that course of education is of no value. Similarly, without the actual production of films, the Columbia course of study in film is valueless.

55. For the spring semester of 2020, students in the visual and sound arts lost 2 months (over half a semester) of curriculum, studio, shop, and facility access, an additional 2 months of studio and facility access for second year students (studio move-out date is usually the second week of July), and an additional 4 months of studio and facility access for first year students (whose normal access extends through the summer into the Fall of their second year). Both the First Year Show and the Second Year Thesis Show were indefinitely postponed.

56. Columbia also announced that it would not be possible to hold Open Studios in the Fall of 2020 for the 2019-2020 first year students. In addition, first year students are likely to incur additional losses as in-person education will be limited and access to courses and facility usage will be mandated low-density during the present Fall and upcoming Spring semesters.

57. The effect of the lock-down and lock-out on arts students was severe. Projects and materials were abandoned inside labs, shops, related facilities, and storage spaces throughout studio buildings, and both first and second year students were unable to complete the education they had begun.

58. Lack of access to materials and specialized facilities made it impossible to continue with research and education and career opportunities were greatly compromised as a result.

59. It is not possible to weld, fire ceramics, run printing presses, or work with wood while quarantined in one's bedroom or living room. It is also not possible to develop film, use equipment and processes that generate toxic fumes, employ oil paint and mediums, use spray adhesive, spray paint, liquid urethane and polyurethane, plaster, silicone without the type of specialized ventilation available in studios and related facilities. In addition, it is impossible for the students to have studio visits with faculty and peers, collectors, gallerists, or art dealers, when they don't have access to studios or any way to create work.

60. Plaintiffs, as students following a course of study in film, are afforded the facilities (including the Production Center and the Digital Media Center) and the resources (including specialized, professional-level film equipment and post-production computer labs) necessary to learn the art of filmmaking and develop the expertise and experience required to enter upon a career in film upon graduation. These facilities and resources are critical to the education Columbia promises in film.

61. Plaintiffs, as students following a course of study in film, are also afforded the opportunity to make actual, professional-level films during their time in the program. First-year students must complete two-short film projects, the "3-5" and the "8-12." Second-year students must complete a longer Second Year Film. Research Arts students, film students in their third, fourth, or fifth year of the film program, must complete a Thesis Film, and may also pursue Non-Thesis work, depending on their professional and creative interests and the concentration (directing, producing, screenwriting) they pursue.

62. These film projects are critical to the education Columbia promises to students in the film program; indeed, students must complete these projects in order to earn their

degree, according to the program degree and graduation requirements published and disseminated by Columbia University.

63.   In order to complete these projects, students require not only access to film equipment and dedicated media facilities, they must also have the ability to establish film sets and shoot films under professional conditions. The projects completed by film students during their time at Columbia, particularly the Thesis Film, often serve as a springboard into their desired film career.

64.   The Production Center and the Digital Media Center closed entirely in mid-March 2020, cutting students off from equipment and resources necessary to develop and shoot their films and engage in post-production work. As well, social distancing requirements and other restrictions related to the coronavirus outbreak shut down film sets and made it impossible to engage in film shoots. As of mid-March 2020, students in the film program were effectively precluded from engaging in any of the filmmaking activities that form the core of the film curriculum and constitute degree requirements for the MFA in film.

65.   Students cannot work on film sets or shoot films online or through some other remote method. Zoom or online courses cannot replace the hands-on, professional film experience that the students were promised and in which they must engage to obtain their degree and to launch a film career.

66.   In each case, students in these disciplines require, in the first instance, access to their studios and work, access to which they were deprived of commencing on March 17. And, in the second instance, the making of artwork, mentorship, critiquing of artwork, and ultimately display of artwork is not only critical to the education Columbia promised plaintiffs, but the core of such education.

## FIRST CLAIM FOR RELIEF
### (Breach of Implied-in-Fact Contract – Restitution)

67. Plaintiffs repeat here the allegations of the foregoing paragraphs of this class action complaint as if fully set forth at length.

68. By reason of the foregoing, defendant Columbia has breached its implied-in-fact contract with plaintiffs.

69. Plaintiffs have been damaged by such breach in an amount to be proven herein, but exceeding $5 million, representing the tuition and fees paid by them to Columbia with respect to the spring semester of 2020.

70. Plaintiffs will be damaged in a further amount to be proven representing tuition and fees at full amount without being afforded the education promised to them for periods beyond the spring semester of 2020.

71. Plaintiffs are entitled to recover such amounts from defendant as restitution for tuition and fees paid.

## SECOND CLAIM FOR RELIEF
### (Breach of Implied-in-Fact Contract – Damages)

72. Plaintiffs repeat here the allegations of the foregoing paragraphs of this class action complaint as if fully set forth at length.

73. By reason of the foregoing, an implied -in-fact contract exists between plaintiffs and defendant.

74. The terms of that contract consist of the specific promises and undertakings on the part of defendant contained in the handbooks for the visual and sound arts programs and the film program, as well as on various other descriptive materials such as catalogues and websites,

75. Plaintiffs promised to and did pay tuition for the skills-based learning those handbooks and other materials describe as constituting the courses of study in the visual and sound arts and in film.

76. By defendant's failure to have provided the promised education, defendant has breached that implied-in-fact contract.

77. Plaintiffs have sustained damages by reason of that breach, and are entitled to recover such damages.

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

78. Plaintiffs repeat here the allegations of the foregoing paragraphs of this class action complaint as if fully set forth at length.

79. By reason of the foregoing, defendant was enriched by securing tuition from plaintiffs but failing to provide promised educational facilities, teaching, and resources necessary for plaintiffs' education in the arts.

80. This enrichment was at plaintiffs' expense.

81. Equity and good conscience militate against permitting defendant to retain such enrichment.

82. Plaintiffs are accordingly entitled to recover from defendant the value of such enrichment in an amount to be determined by the trier of fact but no less than the amount of Five Million ($5,000,000), representing the tuition paid by them to Columbia with respect to the spring semester of 2020 and all other semesters for which Columbia charges and collects full tuition and fees without fulfilling the contractual promises it has made to plaintiffs and the class of persons they represent..

WHEREFORE, plaintiffs demand judgment, on behalf of themselves and the class they represent, awarding them restitution or damages with respect to tuition paid to defendant for at least the spring semester of 2020 , and for such other and further semesters as defendant requires them to pay tuition and fees without affording them the education it promised, and for such other and further relief as the Court may deem just and proper in the circumstances.

Dated: Cornwall-on-Hudson, New York
November 3, 2020

        KARLINSKY LLC

        By: /s/ Martin E. Karlinsky
           Martin E. Karlinsky, Esq.
           Bonnie H. Walker, Esq.
        103 Mountain Road
        Cornwall-on-Hudson, New York 12520
        (646) 437.1430 (Office)
        (917) 623.9102 (Cell)
        martin.karlinsky@karlinskyllc.com
        bonnie.walker@karlinskyllc.com

        *Attorneys for Plaintiffs*