UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

ERIC S. BRITTAIN, KAELA MEI-CHEE
CHAMBERS, JULIAN CALLAGHAN, JOANNA
CHRISTINA CORTEZ, ANTHON SERTEL
DEAN, ANTONIO RATTES DE FARIAS,
CAITLIN FERRELL, KATHRYN MILLER,
GRACE A. PHILIPS, BRADLEY M. PITTS, AVA
RAVICH, ANA I. DOW SILVA, JACLYN E.
TODD, DONOVAN TOLLEDO, and RICARDO J.
VARONA, on behalf of themselves and all others
similarly situated,

                         Plaintiffs,

             -against-

TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK,

                        Defendant.
-------------------------------------------------------------x

20-CV-9194 (PKC)

OPINION AND ORDER

CASTEL, U.S.D.J.

        In this action, students enrolled in Columbia University's Graduate School of the Arts seek tuition refunds for course work that was not conducted in person because of the COVID-19 pandemic.  The fifteen students who are plaintiffs in this putative class action were pursuing a master's degree in fine arts ("MFA"), with specializations in either visual art, sound art, or film.  Due to the pandemic, defendant Trustees of Columbia University in the City of New York ("Columbia" or the "University") suspended much of the studio-based in-person course work and transition it to online platforms.  Plaintiffs assert claims against the University for breach of contract and unjust enrichment.

        After Columbia filed a Pre-Motion letter seeking leave to move to dismiss the claims asserted (Doc 14), plaintiffs filed an Amended Complaint on January 21, 2021 (Doc 18).

On February 22, 2021, Columbia moved to dismiss the action entirely based on the Amended Complaint's failure to state a claim for relief, Rule 12(b)(6), Fed. R. Civ. P (Doc 19).  On July 12, 2021, Plaintiff filed a Second Amended Complaint ("SAC"), identical to the first except for the addition of two additional plaintiffs enrolled in the Sound Art program (Doc 38).  At Columbia's request, the outstanding motion will be deemed to be addressed to the substantially identical Second Amended Complaint (Doc 39).  For the reasons explained below, the motion will be granted in part and denied in part.

BACKGROUND

The fifteen plaintiffs in this action were enrolled in Columbia's Graduate School of the Arts for the Spring 2020 term, at the onset of the COVID-19 pandemic.  (SAC at ¶ 2.)  Six were pursuing an MFA in the school's Visual Arts program, a two-year course of study.  (Id. at ¶ 27.)  Two were pursuing an MFA in the school's Sound Art program, also a two-year course of study.  (Id. at ¶ 28.)  The other seven were pursuing an MFA in the school's Film program, a three-to-five-year course of study.  (Id. at ¶ 29.)  Tuition for these programs at the time was $32,558 per semester.  (Id. at ¶ 32.)  According to plaintiffs, the high cost of tuition was justified by the physical access to facilities and equipment granted to students throughout their enrollment.  (Id.)  Specifically, students enrolled in the Visual Arts and Sound Art programs received access to "highly specialized studio spaces" to produce their work.  (Id. at ¶ 34.)  These studios housed much of the equipment that students used to create their works and served as a meeting place for discussions with professors and critiques by visiting artists.  (Id.)   In addition, Film students were given access to audition and rehearsal spaces to produce and film their projects with professional equipment.  (Id.)

Much of the curricula for these programs revolved around projects produced in

campus facilities with University-supplied equipment.  The Visual Arts "core" curriculum was composed of four components: Graduate Studio, Group Critique, Artist Mentorship, and a Visiting Artist Lecture Series.  (SAC, Ex. A ("Visual Arts Handbook") at 8.)  Each component took place, at least partially, in the student's studio, with the Graduate Studio largely devoted to the critique and development of the student's studio practice.  (Id.)  The Sound Art program had similar Graduate Studio, Visiting Artist Lecture Series, and mentorship components, though it also included several theory-oriented classes taught in classrooms.  (SAC, Ex. B ("Sound Art Handbook").)  Both the Visual Arts and Sound Art programs also involved public expositions. The Visual Arts program included a First Year Show to be held at an on-campus art center, an Open Studios program where second-year students would invite the public to visit their studios, and a Thesis Exhibition where second-year students would present their works to the public. (SAC at  ¶ 62.)  The Sound Art program also included a Thesis Project presented publicly.  (SAC at ¶ 80.)

The Film program was structured slightly differently.  (SAC, Ex. C ("Film Handbook").)  The first two years of the program were composed of several film-specific courses.  During these first two years, each student was required to complete several short films as well.  (Id. at 14; SAC at ¶ 105.)  After the first two years, students began "Thesis Work" which lasted for up to two years and consisted largely of hands-on filmmaking (either directing, screenwriting, or producing), and the production of several short films or screenplays.  (Film Handbook at 6.)  In order to create these screenplays and films and complete their degrees, students utilized production and editing equipment rented from the School of the Arts Production Center.  (Id. at 14.)  The Film Handbook details the reservation process, and explains where students could obtain support to plan other aspects of their films, such as budgeting, casting, and

film locations, and where they could access post-production tools and editing software.

On March 17, 2020, with the realization of the rising number of COVID-19 cases, Columbia suspended its in-person operations, moved all teaching online, and revoked access to campus studios, equipment, labs, shops, and storage facilities.  (SAC at ¶¶ 94, 96.)  Studio access, lab access, and equipment access for MFA students was revoked, and all studio projects were suspended.  (Id. at ¶ 96.)  The public expositions for the Visual Arts and Sound Art students were "indefinitely postponed" and the University announced that it would not hold the Open Studios program for the following Fall 2020 term.  (Id. at ¶¶ 96, 100.)  The University's Production Center and Digital Media Center also closed entirely, precluding film students from filmmaking activities.  (Id. at ¶¶ 108–09.)  Plaintiffs do not argue that this decision was ill-advised; in fact, they acknowledge that these steps "may have been necessary" and that nearly all colleges and universities across the nation did the same.  (Id. at ¶¶ 93, 111.)  Indeed, on March 18, 2020, Governor Cuomo issued an executive order mandating that all non-essential businesses reduce in-person activities by 50 percent, increasing this to 100 percent four days later.  N.Y. Exec. Order Nos. 202, 202.6, 202.8 (Mar. 7, 18, 20, 2020).

Plaintiffs contend that without access to the studios, equipment, and in-person activity integral to their MFA program, Columbia's decision to shutter in-person activity "destroyed the value of the education" that they paid for.  (SAC at ¶ 111.)  They argue that the handbooks and other materials distributed to students made specific promises regarding an in-person education, and having received something substantially different, they are entitled to a refund of the tuition and fees paid, as well as damages.  In response, Columbia asserts that the program handbooks did not provide a specific promise of an in-person education with public expositions and equipment access.  It also argues that, because plaintiffs do not allege that the

University acted in bad faith, it cannot be liable for breach.

RULE 12(b)(6) STANDARD

Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth.  Id.  Instead, the Court must examine the well-pleaded factual allegations, which are accepted as true, and "determine whether they plausibly give rise to an entitlement to relief."  Id. at 678–79.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.' "  Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208–09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

DISCUSSION

A. So-Called "Educational Malpractice"

New York courts are hesitant to entertain actions that "ask the Court to involve itself in the subjective professional judgements of trained educators."  Gally v. Columbia Univ., 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998).  Because such cases rest on the "sound judgment of the professional educators who monitor the progress of their students on a regular basis," "courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community."  Olsson v. Board of Higher Ed., 49 N.Y.2d 408, 413 (1980) (citation and internal quotation marks omitted); see also Donohue v. Copaigue Union Free School Dist., 47 N.Y.2d 440, 444–45 (1979) ("To entertain a cause of action for 'educational

malpractice' would require the courts not merely to make judgments as to the validity of broad educational policies a course we have unalteringly eschewed in the past but, more importantly, to sit in review of the day-to-day implementation of these policies.")

The rare instances where courts have entertained actions that appear on their face to be of the sort forbidden by this "educational malpractice" doctrine are where the educational institution is alleged to have acted arbitrarily, capriciously, or in bad faith, thereby breaching the implied contract with its students.  See, e.g., Sofair v. State Univ. of New York Upstate Med. Center Coll. of Medicine, 54 A.D.2d 287, 290 (4th Dep't 1976).  This is because "the essence of the implied contract [with a student] is that an academic institution must act in good faith in its dealings with its students."  Olsson, 49 N.Y.2d at 414; see also Keles v. New York Univ., No. 91-cv-7457, 1994 WL 119525, at *6 (S.D.N.Y. April 6, 1994) ("implicit in the University's general contract with its students is a right to change the University's academic degree requirements if such changes are not arbitrary and capricious.")  Absent a bad faith allegation, "[w]hen a university . . . acts within its jurisdiction, not arbitrarily but in the exercise of an honest discretion based on facts within its knowledge that justify the exercise of discretion, a court may not review the exercise of discretion."  Carr v. St. John's Univ., New York, 17 A.D.2d 632, 634 (2d Dep't 1962).

This deference does not mean that a claim for breach of contract can never be maintained against a university.  As Judges Wood and Engelmayer have explained, "[m]any enforceable promises by a university or school do not entail forbidden inquiries . . . where a contract has promised the student 'specified services' which the university has failed to provide, a claim may lie."  Goldberg v Pace Univ., No. 20-cv-3665, __ F. Supp. 3d __ 2021 WL 1565352, at *5 (Engelmayer, J) (quoting Paladino v. Adelphi Univ., 89 A.D.2d 85, 92 (2d Dep't 1982)).

"If a contract with a university provides for 'certain specified services,' such as a 'designated number of hours of instruction,' and the university fails to satisfy that obligation, 'a contract action with appropriate consequential damages might be viable.' " Hassan v. Fordham Univ., No. 20-cv-3265, __ F. Supp. 3d __, 2021 WL 293255, at *3 (Wood, J) (quoting Paladino, 89 A.D.2d at 92). Actions based on an academic institution's promise to provide specific services raise questions of basic contract law and do not intrude on an institution's academic judgments in the areas of admissions, grading, satisfaction of degree requirements or hiring and promotion of faculty.

Though the SAC makes references to the "value" of the MFA degree, see SAC at ¶¶ 98, 111, plaintiffs are not asking the Court to substitute its judgment for that of professional educators. Rather, they ask the Court to evaluate statements in the various MFA handbooks, to assess whether the University made and breached any promises. The Complaint does not require the Court to evaluate whether Columbia acted appropriately in suspending classes, whether remote teaching methods were acceptable, or whether the degree conferred upon plaintiffs was without value. The question presented on the motion is whether the plaintiffs have plausibly alleged that University entered into an implied in fact contract to provide in-person teaching consisting of studio and equipment access, and whether, in transitioning to remote learning, the University breached this contract.[1] See Hassan, 2021 WL 293255, at *3–4; In re Columbia Tuition Refund Action, __ F. Supp. 3d__, 2021 WL 790638, at *3 (S.D.N.Y. Feb. 26, 2021) (Furman, J); Zagoria v. New York Univ., No. 20-cv-3610, 2021 WL 1026511, at *3 (S.D.N.Y.

---

[1] Under New York law, a contract may be implied in fact from the actions of the parties. Such a contract is no less binding than a written contract. See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 582 (2d Cir. 2006) (citing Jemzura v. Jemzura, 36 N.Y.2d 496, 503–04 (1975)). The University does not contest the existence of a contract with its MFA students—only the terms of this contract.

Mar. 17, 2021) (Daniels, J); <u>Goldberg</u>, 2021 WL 1565352, at *6 (all holding the same).

B. <u>Breach of Contract</u>

To establish a claim for breach of contract, the plaintiff must allege "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." <u>Second Source Funding, LLC v. Yellowstone Capital, LLC</u>, 144 A.D.3d 445, 445–46 (1st Dep't 2016); <u>see</u> <u>also</u> <u>Johnson v. Nextel Commc'ns, Inc.</u>, 660 F.3d 131, 142 (2d Cir. 2011).  Columbia does not contest the existence of a contract or performance by the plaintiffs.  Rather, it argues that plaintiffs have not identified specific University-made promises that were breached—i.e., the substance of the contract.  <u>See</u> <u>Gally</u>, 22 F. Supp. 2d at 207 ("[T]he mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted.")  In the alternative, Columbia argues that even if specific promises were made and breached, a breach of contract action cannot lie against an educational institution absent a showing of bad faith.

   i.   The Complaint Alleges That Columbia Made
       Specific Promises and the University Breached
       <u>Those Promises.</u>

The SAC alleges that Columbia breached its implied in fact contract to provide an education consisting of "[h]ands-on learning and the creation of works of art or films. . . ."  (SAC at ¶ 33.)  The SAC attaches and incorporates by reference the "handbook" that each MFA program sent to its enrollees, which describe each program's core curriculum, requirements, electives, and the resources available to students.  (SAC Exs. A-C.)  It also attaches a studio lease agreement between each Visual Arts MFA student and the University.  (SAC – Ex. D.)  Under New York law, materials such as "bulletins, circulars and regulations made available to the student" can form the terms of an implied in fact contract between the student and the

university.  Gally, 22 F. Supp. 2d at 206.  But this does not mean that every piece of information disseminated to students constitutes contractual terms between the university and its student body.  "General policy statements and broad and unspecified procedures and guidelines will not suffice."  Nungesser v. Columbia Univ., 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (Woods, J).  "General promises about ethical standards . . . are far different from the types of specific promises which have led to valid breach of contract claims against universities."  Gally, 22 F. Supp. 2d at 207.

Columbia asserts that neither the SAC nor the materials it incorporates alleges any specific and enforceable promise that the University made and breached.  It correctly points out that Judges Wood, Daniels, Furman, and Engelmayer have dismissed all or substantial portions of similar COVID-19 tuition breach of contract actions for this reason.  See Hassan, 2021 WL 293255, at *6–7; In re Columbia Tuition Refund Action, 2021 WL 790638, at *3; Goldberg, 2021 WL 1565352, at *8; Zagoria 2021 WL 1026511, at *4.[2]  But the SAC sets forth allegations relating to the Visual Arts, Sound Art and Film programs that are quite different than those in the cited cases.

The Visual Arts and Sound Art programs within Columbia's MFA program are fairly similar in that they had similarly styled courses and exhibitions surrounding work created in a student's individual studio.  The Film program was structured differently, as the production of film was not confined to an individual University-owned studio.  For this reason, the Court will consider  the Visual Arts and Sound Art programs separately from the Film program to

---

[2] Plaintiffs in In re Columbia Tuition Refund Action, No. 20-cv-3208, purport to represent a class consisting of all persons who paid tuition or fees on behalf of students enrolled in classes at Columbia University for the Spring 2020 semester.  (Doc 42 (Second Amended Complaint), 20-cv-3208 at ¶ 68.)  The putative class in this action consists only of students pursuing MFA degrees.  Of course, the putative classes in neither action have been certified and this Court's decision on the motion to dismiss relates solely to the claims of the fifteen individual plaintiffs.

determine whether, for each program, the SAC alleges "specifically designated and discrete promises" that were made and subsequently breached.  Ward v. New York Univ., No. 99-cv-8733, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000) (Casey, J).

a)     The Visual Arts and Sound Art Programs

The SAC alleges that Columbia promised plaintiffs in both the Visual Arts and Sound Art programs a "rigorously studio-based model of hands-on education."  (SAC at ¶¶ 39, 69.)  The coursework focused on "research and experimentation in the studio and in other specialized facilities" and "in-person studio visits and critiques."  Id.  In support of these allegations, the SAC attaches the 2019-2020 Visual Arts MFA Handbook and the 2019-2020 Sound Art MFA Handbook, (collectively the "Handbooks").  (SAC – Ex. A, Ex. B.)  The Handbooks span 31 and 16 pages respectively and begin with a description of program faculty before delving into the curriculum.  Reviewing the Handbooks in their entirety, the Court concludes that the SAC plausibly alleges that Columbia made several specific promises to Visual Arts and Sound Art students that were not performed.

First, each Visual Arts and Sound Art student was assigned an individual studio on Columbia's campus.  (SAC at ¶ 34.)  The studios, as described in the SAC, were integral to the programs—they were the main setting for each student's design work, and served as the location for meetings between the student and professors, critics, and peers.  (Id. at 33–34.)  Students signed individual lease agreements with the University for their studios located on the campus. (Id. – Ex. D.)  The lease provides that "studio practice is vital" and that "studios may be accessed 24 hours per day seven days per week, including during the winter break, spring break, and summer break. . . ."  (Id. – Ex. D at 1.)  It specifies how students obtain studio keys and how the studios are to be used and cared for.  (Id.)  It outlines how students can access the "Wood,

Metal, and Ceramics Shops" and how to safely use equipment from these shops when working in their studio.  (Id. at 2–3.)  Each student was required to sign and date the lease agreement and provide a cell phone number, and, in turn, the University assigned each of them a specific studio. The lease agreement contains no express term permitting Columbia to revoke a student's right of access under any circumstances.

According to its Handbook, the Visual Arts program was composed of four main "core" components: Graduate Studio, Group Critique, Artist Mentorship, and a Visiting Artist Lecture Series.  (Visual Arts Handbook at 11–12.)  Each component, at least partially, was to take place in the student's studio.  Graduate Studio consisted of "one studio visit each week on Monday night with a full-time professor."  (Id. at 11.)  The objective of Graduate Studio was for students to "carry out individually-directed creative research" and "develop[] [their] studio practice."  (Id.)  Group Critique was "weekly group critique workshops" where "students expose their work to their peers" for feedback.  (Id.)  The Visual Arts Handbook does not specify where the workshops would take place, but each student's work was created and stored in their studio. The Artist Mentorships component was advertised as "a close and focused relationship . . . between a core group of ten to fifteen students and their mentor . . . You will meet with both of your Mentors each semester . . . Mentor weeks may include individual critiques, group critiques, visits to galleries, other artist's studios, museums. . . ."  (Id. at 12.)  The program's description of the Visiting Artist Lecture Series makes the plain assertion that "[e]ach visiting lecturer will provide three individual 40-minute studio visits."  (Id.)

The Handbook for the Sound Art program includes the same Graduate Studio component.  The Handbook describes it as consisting of "studio visits with guest artists, curators, and other interesting people; group critiques and presentations of new work; as well as individual

meetings with the program director. . . ." (Sound Art Handbook at 7.)   It specified that when a visiting critic was attending the Graduate Studio session, "[e]ach student . . . has a private 30 minute studio visit with our guest." (Id.)  Even the descriptions for the traditional theory-based coursework in the program advertised "hands-on experimentation and demonstration" and involved the use of "advanced audio production tools" that students were unlikely to possess at home. (Id. at 8–9.)

The Visual Art and Sound Art programs also promised students a thesis project in their second-year, as the "culmination of the MFA Candidate's course of study." (Visual Arts Handbook at 16; Sound Art Handbook at 9.)  The Sound Art Handbook states that the thesis project "must be publicly presented in the spring semester . . . this public presentation may take the form of a group show, but depending on student needs and interests, other forms of presentation are also possible." (Sound Art Handbook at 9.)  The project "must [include] some physical aspect" with the work "ideally documented by an outside photographer/videographer. . . ." (Id.)  The Visual Arts Handbook does not detail the public expositions offered to students, but the SAC alleges that second-year students were to participate in a "highly publicized, well-attended" Thesis Exhibition and a "highly publicized" fall event where each student's studio is open to the public, called "Open Studios." (SAC at ¶ 62.)  First year students also are to partake in a "professional public exhibition" called the "First Year Show." (Id.)

The allegations of the SAC and the materials which the SAC incorporates, including the course descriptions in the Handbooks and the exemplar of the studio lease, meet the requisite level of "certain specified services" to sustain a breach of contract action. Paladino, 89 A.D.2d at 92.  Columbia's Handbooks promised each arts student a program geared around the physical creation of art.  The Visual Arts Handbook states that each student "*will* have one

studio visit each week," "*will* work primarily with two full-time faculty," and "*will* be assigned two mentors" who would visit their studios and take them to museums and art shows.  (Visual Arts Handbook at 11–12 (emphasis added).)   Plaintiffs allege that when in-person activity was suspended, these meetings no longer happened and studio access was revoked.  (SAC at ¶¶ 96–98.)  The Sound Art Handbook contained similarly definitive promises, such as "there *will* be meetings with the Sound Art mentor artist" or "[f]undamental studio techniques *will* be explored including soldering for building cables, microphones, and loudspeakers."  (Sound Art Handbook at 7–8 (emphasis added).)  According to plaintiffs, these promises also went unfulfilled.  Each student executed a lease agreement with the University for a studio that would be open 24 hours a day, through all breaks in class scheduling.  The SAC alleges that when in-person activity was suspended, the studios were not open 24 hours a day.  (SAC at ¶ 94.)  The language in the handbooks and studio lease constitute far more than "general statements of policy."  Ward, 2000 WL 1448641, at *4.  Columbia promised a program geared around the hands-on creation of physical work on the University campus.  When it transitioned the program online, it allegedly did not deliver this.  Again, the students do not dispute that the University could not deliver what it promised under pandemic conditions.  The thrust of their claims is that the University cannot keep the tuition payments for services it was unable to deliver.

The foregoing descriptions of the allegations of the SAC and the materials it incorporates stand in sharp contrast to the allegations in other cases that dismissed COVID-19 tuition refund cases on the grounds that the course materials creating the implied contract were not sufficiently specific.  In Hassan, the plaintiffs, university students, relied on a catalog containing course descriptions and classroom locations.  2021 WL 293255, at *6.  In Zagoria, the student-plaintiffs relied on marketing and recruitment materials and a course description.  2021

WL 1026511, at *4.  Both actions were dismissed because  the materials on which the plaintiffs'

relied did not "rise to the level of a specific promise to provide in-person educational services"

such that the school had "relinquished its authority to alter the method of academic instruction."

Id. (quoting Baldridge v. New York, 293 A.D.2d 941, 943 (3rd Dep't 2002)).  Even in Goldberg,

where plaintiffs were themselves MFA students of Pace University, the materials (a course

catalog and advertisements) "tacitly presuppos[ed] and almost certainly envision[ed]" in-person

instruction, but fell short of stating that courses would be taught with only in-person meetings.

2021 WL 1565352, at *8–9.

Columbia's MFA handbooks and studio lease are akin to the materials relied upon

by district courts that have upheld contract-based pandemic-related tuition refund actions. See,

e.g., Bergeron v. Rochester Institute of Technology, No. 20-cv-6283, 2020 WL 7486682

(W.D.N.Y. Dec. 18, 2020) (Siragusa, J); Flatscher v. Manhattan School of Music, No. 20-cv-

4496, 2021 WL 3077500 (S.D.N.Y. July 20, 2021) (Failla, J).  In Bergeron, R.I.T.'s promise of

access to the "finest laboratories, technology[,] and computing facilities" constituted a statement

specific enough to survive a motion to dismiss.  2020 WL 7486682, at *1.  Following this

example, Flatscher sustained a breach of contract claim based on the Manhattan School of

Music's description of itself as "a musical conservatory" and a course catalog featuring in-person

recitals and studio performances.  2021 WL 3077550, at *6.  Columbia's Visual Arts and Sound

Art MFA students expected to take classes that required the production and evaluation of art.

They anticipated, and in fact paid tuition money to facilitate, access to University materials and

facilities to produce and store this art.  The course materials, along with the allegations that the

MFA program "could not be conducted as advertised or as required when Defendant moved its

classes online" are sufficient to survive a Motion to Dismiss.  Flatscher, 2021 WL 3077550, at

*6.  See also Ford v. Rensselaer Polytechnic Inst., 507 F. Supp. 3d 406, 416 (N.D.N.Y. 2020) ("What a student expects to receive in exchange for tuition money covers much more territory than simply the right to take classes.").  Columbia's motion to dismiss the breach of contract claims will be denied.

b)      The Film Program

Though students in the Film program were not assigned individual studios, the SAC's incorporation of the Film Handbook nudges the plaintiffs' claims over the plausibility threshold.  The SAC alleges that Columbia failed to provide plaintiffs enrolled in the Film program with a "rigorous program of hands-on learning and skill development, involving actual, professional-level film production."  (SAC at ¶ 82.)  In support of these allegations, the SAC attaches the Columbia MFA Film First Year Handbook.  (SAC – Ex. C.)

The Film Handbook describes a program that revolved around the creation of film.  First and second year students were required to take 60 credits of coursework in classes focused on directing, screenwriting, or producing.  (Film Handbook at 8.)  The Handbook does not describe the courses beyond their titles.  After the coursework was completed, students began "Thesis Work," and were able to choose to specialize in either directing, screenwriting, or producing.  Thesis Work involved close advisement with instructors as each student created either "a thesis film of up to 25 minutes," "an original screenplay," or "a TV or new media thesis package of at least 90 minutes of original pilots of new media writing."  (Id. at 9–10.)  First year students also were required to make several smaller films; the Handbook informs students that they "will be making several smaller productions" called exercises, and that they "will be completing two slightly bigger productions just after your Fall and Spring semesters finish. . . ." (Id. at 16–17.)

- 15 -

The remainder of the Film Handbook describes the various University resources to which each student was entitled.  It reads "As an MFA student at Columbia, you have access to production and post-production resources, advisement, and tailored production education . . . Production staff manages and provides equipment, post-production facilities, and Risk Management insurance for all student productions."  (Id. at 12.)  It describes the "Production Center at Nash" as a facility that was open throughout the semester at proscribed hours, and would rent equipment to students and train them in using it.  (Id. at 14.)  It describes the Digital Media Center as each student's "home-away-from-home" to edit their films and do other work.  (Id. at 15.)

Like the Visual Arts and Sound Art handbooks, the Film Handbook goes beyond a simple listing of the date, time, and location of classes.  Rather, it is the promise of a program centered on the student's film production or screenwriting, with access to film locations, film equipment, editing equipment, and expert professors to instruct and critique.  Columbia retains the leeway to adjust the program as is needed; even removing certain classes or requirements and adding substitutes is within their pedagogical expertise.  But it must provide that which it promised.  Columbia was not at fault for shuttering on-campus facilities.  But that does not mean that it is entitled to keep the students' tuition payments for undelivered services.  When in-person activity was shuttered, the Production Center at Nash and the Digital Media Center were closed. (SAC at ¶ 108.)  Film production and editing equipment was not available to students.  (Id.) Without this, plaintiffs could not produce films.  (SAC at ¶ 109.)  These allegations are more than mere "quality and adequacy" complaints.  Paladino, 80 A.D.2d at 92.  Columbia promised a curriculum built upon film produced by the students.  It allegedly delivered something else entirely.

ii.    Columbia May Be Liable for Breach
<u>Absent an Allegation of Bad Faith.</u>

Columbia next argues that even if plaintiffs can identify specific promises incorporated into the implied contract, a breach of the contract is still not alleged absent a showing of bad faith.  Columbia posits that the bad faith requirement should be an implied term of its contract with students.  Plaintiffs do not contest that the SAC does not allege bad faith.  Rather, they argue that bad faith is not a requirement of every breach of contract action against an educational institution.  The Court agrees that there is no requirement under New York law that bad faith be pled and proven before a University can be held liable for any and all breaches of an agreement with its students.

Judges in this district have concluded that the bad faith requirement does not apply where there is an allegation of specific contractual promises that have been breached.  <u>In re Columbia</u>, 2021 WL 790638, at *7 (Furman, J) (collecting cases).[3]  New York courts often require a plaintiff to demonstrate bad faith or arbitrary action where the claim is based upon an educational institution's exercise of judgment or discretion in a matter concerning academic standards.  <u>See</u>, <u>e.g.</u>, <u>Matter of Susan M. v. New York Law School</u>, 76 N.Y.2d 241, 246 (1990) ("the determinations of educational institutions as to the academic performance of their students . . . is limited to the question of whether the . . . determination was arbitrary or capricious, irrational, made in bad faith or contrary to Constitution or statute.").  But inherent in the conduct of the affairs of an educational institution—and known to the counterparty to the contract, i.e. the student—are that educational judgments, including admissions, grading, course and degree

---

[3] Columbia relies upon Judge Wood's opinion in <u>Hassan</u>, 2021 WL 293255, at *7–9 that appears to require a showing of bad faith.  In a subsequent opinion, Judge Wood adopted the reasoning of Judge Furman, finding the bad faith requirement inapplicable.  <u>Hassan v. Fordham Univ.</u>, __ F. Supp. 3d __, 2021 WL 1263136, at *2 (S.D.N.Y. Apr. 6, 2021).

requirements, will be made by the institution.  This is an aspect of the so-called "educational malpractice" doctrine discussed previously, see supra pages 5–7.  "Matters involving academic standards generally rest on the subjective judgment of professional educators . . . Though such matters are subject to judicial scrutiny, the issue reviewed in such a case is whether the institution has acted in good faith or its action was arbitrary or irrational."  Tedeschi v. Wagner Coll., 49 N.Y.2d 652, 658 (1980) (citing Olsson, 49 N.Y.2d at 408).

As Judge Furman noted, when confronted with the question of "whether an educational institution breached a specific promise to provide discrete services" or, in other words, a suit where deference to the educational institution is not warranted, courts "generally have not inquired into whether the challenged decision was arbitrary or made in bad faith."  In re Columbia, 2021 WL 790638, at *7.  When the University's own specific promises set forth in a catalogue, handbook, brochure, or explicit contract are alleged to have been breached, there is no educational judgment to which a court can or should defer.

As the Court has already held, this breach of contract action is not based on Columbia's educational judgment in matters of academic standards.  It is based on the terms of an implied in fact contract between the University and its students.  As such, there is no requirement that the University acted in bad faith or an arbitrary manner.

iii.    Impossibility is Not a Defense at This Stage.

Columbia next argues that its performance under the implied contract with plaintiffs was impossible as of March 22, 2020, when Governor Cuomo's executive orders prohibited universities from holding in-person classes.  First, this argument is not properly adjudicated at this stage of litigation, before discovery and a fact record are developed.  But even disregarding this, the argument fails.

The remedy for impossibility, or its related and more applicable principle, frustration of purpose, is rescission of the contract.  See United States v. General Douglas McArthur Senior Village, Inc., 508 F.2d 377, 381 (2d Cir. 1974) ("The common law of contract excuses a party from performing his contractual obligations because of impossibility of performance or frustration of purpose . . . discharge by reason of impossibility—as well as the concomitant remedy (to the discharge) of rescission—enforces what can reasonably be inferred to be the intent of the parties at the time of contract.") (citation omitted).  Though Columbia argues that the contract was impossible to perform, it refuses to rescind the contract or refund the money paid to it.  Assuming frustration of purpose or impossibility of performance, Columbia has not demonstrated that New York law allows it to simply keep the students' money or offer them a bespoke make-good remedy of its own choosing.  See, e.g., Ross Univ. School of Med. v. Brooklyn-Queens Health Care, 2012 WL 6091570, at *15 (E.D.N.Y. Dec. 7, 2012) (Mann, M.J.); Univ. of Minnesota v. Agbo, 673 N.Y.S.2d 812, 813 (2d Dep't 1998); Sokoloff v. Nat'l City Bank of N.Y., 208 A.D. 627, 630 (1st Dep't 1924); Flaster v. Seaboard Gage Corp., 61 N.Y.S.2d 152, 155–56 (N.Y. Sup. Ct. 1946).

C. Unjust Enrichment

Plaintiffs also bring a claim of unjust enrichment against Columbia, alleging that in keeping tuition payments but not providing the promised facilities, teaching, activities, and resources, the University was enriched at their expense.

To state a claim for unjust enrichment, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  Georgia Malone & Co. v. Rieder, 973 N.E.2d 743, 746 (N.Y. 2012) (quoting Mandarin Trading Ltd. v.

Wildenstein, 944 N.E.2d 1104, 1110 (N.Y. 2011)).  When a plaintiff has asserted a claim based

upon a valid and enforceable contract, an unjust enrichment claim should be dismissed as

redundant.  See TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc., No. 16-cv-8722, 2017

WL 2627912, at *4 (S.D.N.Y. June 16, 2017) (Castel, J) ("Because the Court concludes that

[plaintiff] has demonstrated its entitlement to default judgment against NEMC on its breach of

contract claim, its motion for entry of default judgment on its unjust enrichment claim is denied

as duplicative.").  See also Clark-Fitzpatrick, Inc. v. Long Island R. Co., 516 N.E.2d 190, 193

(N.Y. 1987); Schultz v. Gershman, 68 A.D.3d 426, 427 (1st Dep't 2009) ("Plaintiffs' unjust

enrichment cause of action is barred by the existence of the contract between the parties.")

(citation omitted).

   Plaintiffs' unjust enrichment claim "rest[s] on the same factual allegations as their

contract claims."  In re Columbia, 2021 WL 790638, at *9.  It seeks the same remedy as the

breach of contract claims.  Columbia does not contest that the implied in fact contract between

Columbia and plaintiffs governs the relationship between the University and its students.  See D.

Mem. at 30 ("there can be no question that such an implied contract exists under New York law

and that it governs the student-university relationship.").  In the face of a valid and enforceable

contract, the quasi-contract claim of unjust enrichment should be dismissed.  See Amable v. New

School, No. 20-cv-3811, 2021 WL 3173739, at *12 (S.D.N.Y. July 27, 2021) (Karas, J)

("Because the Parties do not dispute that they shared a contractual relationship and because

Plaintiffs' unjust enrichment claim is indistinguishable from [their] contract claim, the Court

dismisses the unjust enrichment claim.") (citations and internal quotation marks omitted).  See

also In re Columbia, 2021 WL 790638, at *9; Zagoria, 2021 WL 1026511, at *5; Goldberg, 2021

WL 1565352, at *11–12 (dismissing similar unjust enrichment claims for the same reasons).

CONCLUSION

For the reasons stated above, Columbia's motion to dismiss the SAC  is

GRANTED in part and DENIED in part.  Plaintiffs' unjust enrichment claim is dismissed (Third

Claim for Relief).  The breach of contract claims survive the motion to dismiss.  The Clerk is

directed to terminate the motion (Doc 19).


SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        August 11, 2021